EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GARY W. SCHONS
Senior Assistant Attorney General
DANIEL ROGERS
Deputy Attorney General
KYLE NIKI SHAFFER, State Bar No. 122374
Deputy Attorney General
 110 West A Street, Suite 1100
 San Diego, CA 92101
 P.O. Box 85266
 San Diego, CA 92186-5266
 Telephone: (619) 645-2226
 Fax: (619) 645-2191
 Email: Niki.Shaffer@doj.ca.gov

*Attorneys for Respondent*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RONALD EDWARD MONTIJO, SR.**, <br><br> *Petitioner*, <br><br> v. <br><br> **THOMAS HOFFMAN,** *Director*, <br><br> *Respondent*. | 08cv0088 WQH (NLS) <br><br> **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |

**STATEMENT OF THE CASE**

Following a jury trial, Petitioner was convicted for one count of preparing false documentary evidence in violation of California Penal Code section 134. Petitioner admitted the truth of an allegation that he had sustained one prior conviction for a serious and/or violent felony (Cal. Penal Code §§ 667, 1170.12). On March 11, 2005, the trial court sentenced Petitioner to an aggregate term of four years in state prison. (Pet. at 2; CT 213.)

Petitioner appealed the judgment. (Lodgments 3-5.) On June 14, 2006, the state appellate court filed an unpublished opinion in case number D046391, unanimously affirming the judgment. (Lodgment 6.)

Petitioner subsequently filed a petition for review in the California Supreme Court. (Lodgment 7.) The petition was denied on September 27, 2006. (Lodgment 8.)

On December 27, 2007, Petitioner filed the pending federal Petition. This Court ordered Respondent to file a response to the Petition on January 16, 2008.

## STATEMENT OF FACTS [1]

In 2003 Caroline Carmichael pleaded guilty to driving under the influence (DUI), and was ordered to attend an 18-month counseling program at Occupational Health Services (OHS) in San Marcos. The program required group counseling every week, individual meetings every other week, and attendance at Alcoholics Anonymous (AA) meetings. During her orientation with OHS, Carmichael was told that if she did not comply with the program's requirements, she would be sent back to court.

Petitioner was the OHS counselor assigned to Carmichael. He was the group counselor, as well as the counselor for her individual meetings. Petitioner told Carmichael that if she did not comply with the requirements of the program, he could send her back to court. In her mind, this meant going to jail.

Carmichael did not attend the required AA meetings. She quit attending them after five weeks. Petitioner counseled her that she needed to attend those meetings. After a few weeks, Petitioner filled out her attendance record to show that she was attending AA meetings and said, "This is going to cost you." Carmichael understood this to mean that Petitioner wanted money. That first time she gave Petitioner $200. This occurred in the summer of 2003, about five months into

///

---

1. The statement of the facts is derived from the state appellate court's opinion filed on June 14, 2006. (Lodgment 6, at 2-11; *see Garvin v. Farmon*, 258 F.3d 951, 952 (9th Cir. 2001).)

1  the program. Carmichael gave Petitioner money because he threatened to send her back to court
2  and told her she would be sent to jail.

3  At every meeting after the first time she gave Petitioner money, he asked for money
4  to sign off on the AA attendance card. Carmichael gave Petitioner a total of $500 to $1,000, usually
5  in increments of $100. Petitioner filled out a chart that falsely verified that she had gone to AA
6  meetings.

7  In late 2003 Carmichael told Petitioner that she did not have any more money to give
8  to him. He responded that there were other ways that she could pay. At the time he said this,
9  Petitioner started to put his hands on her, so she thought he meant sexual favors. Petitioner gave her
10  a hug at every meeting and said how pretty she was, and, "I bet you taste so good." It started with
11  Petitioner putting his arms around her back. However, as time went on he dropped his hands to her
12  buttocks. Carmichael did not object because she was scared. Petitioner asked her when she had days
13  off from work, and told her he would come by her house. Carmichael told him that she was always
14  working.

15  Through 2004 Petitioner touched Carmichael's private parts over and under her clothing.
16  She did not say anything to Petitioner because she was afraid he would send her back to court, and
17  she would have to go to jail because she was not complying with the terms of her probation. After
18  Petitioner started touching her, he would do it at every individual meeting. Carmichael never said
19  no because she wanted to complete the program.

20  Carmichael also did not attend all the required group meetings. At each group meeting
21  she was required to sign an attendance card, which was also signed by her counselor. The attendance
22  log was kept at the OHS building. At the end of each meeting Carmichael was also required to sign
23  a progress note about the topic discussed in the group meeting. Her counselor would also sign the
24  progress note. Petitioner kept the records regarding Carmichael's attendance at group meetings.
25  Carmichael missed nine meetings and only made up seven of those meetings by going to makeup
26  group sessions.

27  Petitioner provided documentation stating that Carmichael had completed sufficient group
28  sessions, although she missed two sessions. Petitioner brought the attendance logs to Carmichael

and told her to sign in for two makeup group sessions for April 14 and April 28, 2004, that were run by him. Carmichael did not attend those makeup sessions, but signed the attendance logs because Petitioner told her to do so. Petitioner also gave Carmichael a card showing attendance at three AA meetings. Petitioner prepared a form showing that Carmichael had attended all 52 required AA meetings and all required group counseling sessions.

In September 2004 Carmichael had an exit interview with Petitioner on her last day in that portion of the program, and Petitioner gave her the document showing that she had finished all her AA meetings and all needed group makeup classes. Petitioner told her to sign it, and that he had taken care of everything. Carmichael signed the document.

During the exit interview, Petitioner asked for directions to her house and said he was coming over the following Tuesday. Carmichael gave Petitioner directions to her house because she was scared.

Carmichael then called the sheriff's department and told them what Petitioner had done. After Carmichael contacted law enforcement and OHS about Petitioner's actions, Petitioner tried to call her cell phone, but she did not answer. Petitioner called about 15 times that day, but she did not answer. At the sheriff's direction, she placed a call to Petitioner at home from the sheriff's office. When he answered the phone and she identified herself, Petitioner hung up.

Carla Cline, the manager of the restaurant where Carmichael worked, testified and provided time-card records showing that Carmichael was at work on April 14 and 28, 2004, at the same time as the group meetings.

Detective Daniel Deese of the San Diego Sheriff's Department conducted surveillance on Petitioner on the day Petitioner had told Carmichael that he was going to her house. Petitioner drove away from his house and, while on the freeway, he drove erratically, alternately accelerating, changing lanes, and slowing down. He was then followed on surface streets and when he eventually stopped at a residence, the detectives made contact with him. Detective Deese's partner told Petitioner he was being arrested for sexual assault. Petitioner responded, "It's a lie, . . . she is a drug addict. She's a drunk. She's making the whole thing up." Petitioner also stated that it was his word against hers and that the matter would not go anywhere.

At the San Marcos sheriff's station, Petitioner was advised of his *Miranda*[2/] rights and agreed to waive them. Petitioner identified Carmichael as the accuser. Petitioner first told the officers that he never touched Carmichael, but later told them that he might have hugged her once. He did not know why Carmichael would accuse him of the things she had. He tried to call her 15 times the day before because OHS administrators had pulled her file, and he wanted to find out what was going on. He hit the redial button on his phone several times. Petitioner denied falsifying any documents, and stated that he was not able to access them even if he had wanted to.

At first Petitioner told the officers that nothing happened between him and Carmichael. Later, however, he said that at the exit interview Carmichael told him she did not want to be transferred to another counselor, and she offered to be Petitioner's "woman on the side" if he would continue to be her counselor. He told her he could not do that. He told police that Carmichael also gave him her address. Petitioner thought Carmichael was making accusations against him because she was upset that he had rebuffed her. He also stated that he thought she was making the accusations to get out of the remaining months of the program.

Petitioner admitted that there was flirting between him and Carmichael. He also admitted that he told Carmichael that he was coming over to her house that day and that she probably believed him. However, he claimed that he did not intend to go to her house.

Sandy LaPrade, a close friend of Carmichael's, testified that Carmichael complained about Petitioner on numerous occasions prior to September 2004. Carmichael told her that Petitioner was a "pig" and was always asking her for money and always putting his hands on her. Carmichael told her it started with him grabbing her butt, then her breasts, and it was getting progressively worse.

Adelina Olmos was a member of Carmichael's counseling group at OHS. She and Carmichael had shared the observation that Petitioner was flirtatious. On one occasion during an individual meeting Petitioner told Olmos that she looked "good enough to eat." This comment upset her, and when Petitioner became aware of this by the look on her face, he apologized. Petitioner once told her that she needed a strong man to take care of her, and that if she were his

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

woman he would take care of her. There were times when his comments in face-to-face meetings seemed inappropriate. Carmichael told her about what had happened between her and Petitioner, but only after she had gone to the police and Olmos asked Carmichael what had happened.

**Defense Case**

Petitioner testified in his own defense. In 1975 he was addicted to drugs. He had six felony convictions. The first conviction was for manslaughter. The other five convictions were for possession of firearms and drugs. He was in and out of prison from 1980 to 1996. When he was released from prison in 1996 he went into a drug rehabilitation program, obtained an associate-in-art degree from Palomar College and thereafter became a drug and alcohol counselor.

Petitioner first met Carmichael in July 2003, when he was assigned as her counselor in her 18-month DUI program at OHS. He was her counselor for 14 months. Petitioner kept a record of Carmichael's progress through the DUI program by a "DUI Tracking Sheet" he kept in her file. Carmichael performed poorly in the program and was suspended three times.

To dismiss a person from the program, a counselor would send the person's file to the counselor's supervisor and ultimately to the OHS director. As Petitioner admitted, the director could then send the client back to court for noncompliance with the OHS program:

> Q  Mr. Montijo, the question is, how do you get dismissed? . . . [Y]ou get dismissed because you the counselor submit the file to a director or supervisor and it goes up the chain until the person [who's] in charge decides there's no compliance; is that right?
>
> A  Yes.
>
> Q  All right. So once somebody gets dismissed based on the files that you create as a counselor they get sent back to court?
>
> A  Uh huh.
>
> Q  Correct?
>
> A  Yes.

Petitioner testified that Carmichael finished all classes in the first two phases of the program: 35 group counseling sessions, 26 individual sessions, 6 education classes, and 52

///

1  self-help (AA) meetings. Petitioner documented Carmichael's completion of the first two phases
2  of the program.

3  According to Petitioner, Carmichael brought in cards showing she had completed all
4  52 self-help (AA) meetings. He had no independent way of verifying if she had attended the
5  meetings. At her last individual meeting, Carmichael brought in a card showing attendance at three
6  AA meetings. Petitioner told Carmichael that it looked falsified.

7  Petitioner was shown makeup group progress notes for April 14 and 28, 2004, signed
8  by Petitioner and Carmichael. Petitioner testified that Carmichael attended the group sessions
9  on April 14 and 28, 2004.

10  The individual meetings were held in three-sided cubicles and lasted about 15 minutes.
11  There was a lot of traffic on the floor when counselors were conducting these meetings and people
12  were walking by the cubicle all the time. Petitioner's supervisor would frequently check the cubicles
13  during the face-to-face meetings. Additionally, anyone could easily hear what was going on in
14  adjacent cubicles.

15  In Petitioner's last individual meeting with Carmichael in September 2004, she asked him
16  to get her out of the remaining six months of the program in exchange for money or sex. He told her,
17  "No way." Carmichael told him to come to her house the following Tuesday if he changed his mind.
18  To "humor" her, he told her he would come by.

19  Petitioner denied falsifying any court documents or OHS documents.

20  When he was arrested by police for sexual assault, Petitioner was advised of his *Miranda*
21  rights and agreed to speak with the officers. However, he did not tell them that Carmichael had
22  propositioned him three days earlier. Instead, he said he did not know why she would claim he
23  sexually assaulted her.

24  Carmichael denied being an alcoholic, and this was a barrier to completion of the program
25  according to Petitioner. However, in all his assessments of her Petitioner wrote that she had no
26  barrier to completion. Petitioner always wrote that Carmichael believed that the program was
27  helping her, although she actually thought it was not.

28  ///

1  Carmichael's attendance at AA meetings was sporadic. However, the tracking sheet that he filled out showed she attended meetings almost every week, and sometimes two or three times a week. Petitioner explained this by saying that what he meant was that Carmichael was regular in attendance but not regular in bringing in proof of meetings.

Petitioner's supervisor, William Horejs, testified that Petitioner was an excellent employee and that there had never been anything in his client files that caused him concern about his work performance. There had never been any complaints about Petitioner making improper sexual advances. He considered Petitioner an honest person, and he had never heard anyone question his competence or integrity.

Horejs routinely walked around the cubicle area as a quality control measure. It was not difficult for a person in one cubicle to hear what was going on in the other cubicles. Two coworkers of Petitioner's who worked in the cubicles adjacent to his, testified that one could easily hear what went on in the adjoining cubicle, and they had never heard anything inappropriate coming from Petitioner's cubicle.

## ARGUMENT

### I.

**PETITIONER HAS FAILED TO PRESENT A VIABLE CLAIM UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT BECAUSE HE CANNOT DEMONSTRATE THAT THE STATE COURTS' RESOLUTION OF HIS CLAIMS WAS UNREASONABLE WITHIN THE MEANING OF THE ACT**

The pending Petition, filed on December 27, 2007, is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S. Ct. 2059, 2063, 138 L. Ed. 2d 481 (1997). Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438, 161 L. Ed. 2d 334 (2005).

"Clearly established Federal law," for purposes of § 2254(d)(1) review, "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000); *see also Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172, 155 L. Ed. 2d 144 (2003) (clearly established federal law is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision"). Section 2254(d)(1) "plainly restricts the source of clearly established law to the Supreme Court's jurisprudence." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004); *see also Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002) (only the Supreme Court's decisions "can form the basis justifying habeas relief"). Although "[o]nly Supreme Court precedents are binding on state courts under AEDPA," Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1036, 126 S. Ct. 735, 163 L. Ed. 2d 578 (2005).

Under the first prong of § 2254(d)(1), a state-court decision is "contrary to" federal law if the state court applies a rule that contradicts the governing law as stated by the Supreme Court or reaches a different conclusion than that reached by the high court on materially indistinguishable facts. The second prong of § 2254(d)(1) is met when a state court identifies the correct governing legal principle from the Supreme Court decisions, but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412-413, 120 S. Ct. at 1523.

The "unreasonable application" inquiry is an objective one, and the standard is not satisfied simply by showing error or incorrect application of the governing federal law. *Lockyer v. Andrade*, 538 U.S. at 75, 123 S. Ct. at 1174; *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (per curiam); *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521. "[E]ven if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry*

1  *v. Johnson*, 532 U.S. 782, 793, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9 (2001). Further, the Supreme Court has explained that the "range of reasonable judgment" to be assessed under the "unreasonable application" prong is dependent on the nature of the clearly-established law in question, to wit, whether the rule the high court has stated is general or specific. As to specific legal principles, the "range of reasonable judgment" "may be narrow." As to general standards, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004).

Section 2254(d)(2) applies when an "intrinsic analysis" of the state court's fact-finding process is implicated, *i.e.*, "where petitioner challenges the state court's findings based entirely on the state record." *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004); *see also Weaver v. Palmateer*, 455 F.3d 958, 963 n.6 (9th Cir. 2006). A federal habeas court may not grant relief under § 2254(d)(2) unless "it determines that the state court was not merely wrong, but actually unreasonable," *Taylor*, 366 F.3d at 999. "[M]ere doubt as to the adequacy of the state court's findings of fact is insufficient"; the court "'must be satisfied that *any* appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Lambert*, 393 F.3d at 972 (quoting from *Taylor*, 366 F.3d at 1000).

Where the state supreme court has summarily denied a claim, a federal court conducting habeas corpus review must "look through" the summary denial and consider the "last reasoned" state-court decision. *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803-804, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991). Here, since the California Supreme Court summarily denied review (Lodgment 8), the last reasoned decision is the California Court of Appeal's opinion (Lodgment 6).

///

///

///

## II.

**THE STATE COURTS REASONABLY CONCLUDED THAT SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S CONVICTION**

In his first claim, Petitioner contends that the evidence presented in the trial court was insufficient to support his conviction for preparing false evidence. (Pet., at 5-9.) The state courts reasonably rejected an identical claim in findings which are neither contrary to, nor an unreasonable interpretation of, United States Supreme Court precedent or the facts presented. 28 U.S.C. § 2254(d).

**A. Applicable Law**

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may only be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under *Jackson*, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also Wright v. West*, 505 U.S. 277, 284, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992). "Put another way, the dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982-983 (9th Cir. 2004) (en banc) (quoting *Jackson*).

When the factual record supports conflicting inferences, the federal court must presume — even if it does not affimative1y appear on the record — that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *See Jackson*, 443 U.S. at 326.

1  "*Jackson* cautions reviewing courts to consider the evidence 'in the light most favorable to the
2  prosecution.'"  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (quoting *Jackson*).
3  Additionally, "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain
4  a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  The federal
5  court must refer to the substantive elements of the criminal offense as defined by state law and look
6  to state law to determine what evidence is necessary to convict on the crime charged.  *See Jackson*,
7  443 U.S. at 324 n.16; *Juan H.*, 408 F.3d at 1275.

8  The *Jackson* standard applies to federal habeas claims attacking the sufficiency of the
9  evidence to support a state conviction.  *See Juan H.*, 408 F.3d at 1274; *Chein*, 373 F.3d at 983;
10  *see also Bruce*, 376 F.3d at 957.  The AEDPA, however, requires the federal court to "apply the
11  standards of *Jackson* with an additional layer of deference." *Juan H.*, 408 F.3d at 1274.  The federal
12  court must ask "whether the decision of the California Court of Appeal reflected an 'unreasonable
13  application' of *Jackson* and to the facts of this case."  *Id.* at 1275; see also *id.* at n.13.

### B. The State Appellate Court Reasonably Determined That Sufficient Evidence Supports Petitioner's Conviction for Preparing False Evidence

17  In his first contention, Petitioner maintains that insufficient evidence supports his
18  conviction for preparing false evidence because no evidence was presented to support a finding
19  that Petitioner produced a document for a fraudulent or deceitful purpose or that he intended to
20  produce the document at a legal proceeding.  (Pet., at pp. 5-9.)  The state appellate court correctly
21  applied the *Jackson* standard of review in rejecting an identical claim.  (Lodgment 6, at 11, citing
22  *Jackson v. Virginia*, 443 U.S. at 319.)  The state appellate court noted:

> [California Penal Code section] 134 provides:
>
> "PREPARING FALSE EVIDENCE.  Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, *with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry* whatever, authorized by law, is guilty of felony."  (Italics added.)
>
> There is sufficient evidence from which the jury could find that Montijo [Petitioner] prepared the false documents stating that Carmichael had complied with the terms of her probation for a fraudulent or deceitful purpose.

> Carmichael testified that she was threatened, both at orientation and by Montijo, that if she did not attend the required meetings, she would be kicked out of the program, would be sent back to court, and would go to jail. The evidence shows that Montijo put false information on the documents tracking her compliance for the purpose of defrauding the court with a representation that Carmichael *had* complied with the court-ordered program.
>
> Likewise, there is sufficient evidence to demonstrate that Montijo intended the false documents to be produced "upon any trial, proceeding, or inquiry whatever." The program Carmichael attended was a condition of her probation. Montijo was responsible for keeping track of Carmichael's compliance with the program. If there was a lack of compliance, OHS would notify the court. Similarly, OHS would have to provide the court with proof that Carmichael had successfully completed the program. This could only be done based upon Montijo's false recording and reporting of Carmichael's compliance with the program. Montijo's understanding that what he recorded on Carmichael's compliance documents determined whether or not she would successfully complete that term of probation is sufficient to show his intent that the documents would be produced "upon any trial, proceeding, or inquiry whatever." Substantial evidence supports Montijo's conviction on count 1.

(Lodgment 6, at 12-13.)

The state appellate court's conclusion was neither contrary to, nor an unreasonable interpretation of, United States Supreme Court precedent or the facts presented. 28 U.S.C. § 2254(d). Based on the foregoing, the state courts reasonably rejected Petitioner's claim of insufficient evidence.

### III.

**THE STATE COURTS REASONABLY DETERMINED THAT CALIFORNIA PENAL CODE SECTION 134 IS NOT UNCONSTITUTIONALLY VAGUE**

In his second and final claim, Petitioner maintains that California Penal Code section 134 is unconstitutionally vague because the statute fails to provide adequate notice as to what activities it prohibits. (Pet., at 5-9.) The state appellate court specifically interpreted and relied upon precedent from the United States Supreme Court in reasonably rejecting Petitioner's claim.

In considering whether a statute is impermissibly vague, the United States Supreme Court determines whether the statute is definite enough to provide a standard of conduct for those whose activities are proscribed and a standard for enforcement and ascertainment of guilt. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); *see also Grayned v. City of*

*Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The state appellate court employed this standard in considering and rejecting Petitioner's claim that California Penal Code section 134 is unconstitutionally vague. The court noted:

> With respect to whether the statute at issue in this case is impermissibly vague, we ask the following question: Does [California Penal Code] section 134 provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly?" (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108.)
>
> Section 134 is not unconstitutionally vague as to the terms "proceeding" or "inquiry." First, the statute limits them to those proceedings or inquiries "authorized by law." This means not only court proceedings, but also administrative hearings or inquiries established by statute. In *People v. Clark* (1977) 72 Cal. App. 3d 80 the defendant was charged with violating section 134 based on his alleged preparation of a false document introduced by his representative at a grievance committee hearing at a state university where defendant had sought employment. The trial court dismissed the information, ruling section 134 did not apply to such an administrative proceeding. The appellate court reversed, holding section 134 clearly encompassed the grievance board hearing, as it was both a *proceeding* authorized by and an *inquiry* pursuant to law, i.e., [California] Education Code section 24315. As the [California] Court of Appeal in *Clark* held: "The Legislature in addition to providing that this section apply to full-scale trials, provides a penalty for falsely produced material at other proceedings or inquiries 'authorized by law,' which plainly need not be full-scale trials. [Citation.]" (*People v. Clark*, *supra*, 72 Cal. App. 3d at pp. 83-84, fn. omitted.) The court went on to note that the objective of section 134 "is to prevent the fraudulent introduction of material in a proceeding under the authority of law. To apply the . . . section to inquiry proceedings is necessitated by the purpose of discouraging introduction of this material." (*People v. Clark*, *supra*, at p. 84.)
>
> Thus, section 134 applies to court proceedings, as well as administrative hearings and inquiries, so long as they are established by statute. Therefore, it is not so broad, as Montijo [Petitioner] contends, that it would apply to "[a] parent fibbing on the note he writes to send with his child to school, about the child's absence the day before," nor to a "middle manager at a corporation who fudges some figures on a report requested by his supervisor."
>
> Moreover, it is not unconstitutionally vague as applied in this case. Here, the falsified documents were to be used to determine Carmichael's compliance with a term of her probation. Thus, they were to be used with regard to a formal court proceeding, not an "inquiry" outside formal court process. Nor is there any basis for counsel for Montijo's statement that what Montijo did constituted nothing more than "a counselor's fiction on a trivial bureaucratic form" or that Montijo was merely giving a client a "'break' on some trivial formality or other" such that "no person in a job like [Montijo's] could have been on notice that what [he] did was proscribed . . . ." Falsifying documents that track a probationer's compliance with a condition of probation is a serious matter that any reasonable counselor would realize is both unethical and illegal, and which seriously harms the integrity of the court-ordered probation system.

(Lodgment 6, at 14-15.)

Based on the foregoing, Petitioner is unable to demonstrate that the state court's findings were contrary to, or an unreasonable application of, United States Supreme Court precedent or the facts in this case. Accordingly, this Court should summarily reject Petitioner's claim.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Petition for Writ of Habeas Corpus be denied with prejudice and that no certificate of appealability issue from the denial.

Dated: March 17, 2008.

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GARY W. SCHONS
Senior Assistant Attorney General

DANIEL ROGERS
Deputy Attorney General


  *s/*K**YLE** N**IKI** S**HAFFER**

KYLE NIKI SHAFFER
Deputy Attorney General

*Attorneys for Respondent*

KNS:sm
80216867.wpd
SD2008700055

# TABLE OF CONTENTS

*Page*

STATEMENT OF THE CASE ......................................................................... 1

STATEMENT OF FACTS ............................................................................... 2

    Defense Case ........................................................................................... 6

ARGUMENT ..................................................................................................... 8

    I.    **PETITIONER HAS FAILED TO PRESENT A VIABLE CLAIM UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT BECAUSE HE CANNOT DEMONSTRATE THAT THE STATE COURTS' RESOLUTION OF HIS CLAIMS WAS UNREASONABLE WITHIN THE MEANING OF THE ACT** ............ 8

    II.   **THE STATE COURTS REASONABLY CONCLUDED THAT SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S CONVICTION** ............ 11

        A.    Applicable Law ............ 11

        B.    The State Appellate Court Reasonably Determined That Sufficient Evidence Supports Petitioner's Conviction for Preparing False Evidence ............ 12

    III.  **THE STATE COURTS REASONABLY DETERMINED THAT CALIFORNIA PENAL CODE SECTION 134 IS NOT UNCONSTITUTIONALLY VAGUE** ............ 13

CONCLUSION ............ 15

# TABLE OF AUTHORITIES

*Page*

**CASES**

*Brown v. Payton*
544 U.S. 133
125 S. Ct. 1432
161 L. Ed. 2d 334 (2005) ..... 9

*Bruce v. Terhune*
376 F.3d 950 (9th Cir. 2004) ..... 12

*Campbell v. Rice*
408 F.3d 1166 (9th Cir. 2005)
*cert. denied*, 546 U.S. 1036
126 S. Ct. 735
163 L. Ed. 2d 578 (2005) ..... 9

*Carey v. Musladin*
___ U.S. ___
127 S. Ct. 649
166 L. Ed. 2d 482 (2006) ..... 9

*Chein v. Shumsky*
373 F.3d 978 (9th Cir. 2004) ..... 11, 12

*Garvin v. Farmon*
258 F.3d 951 (9th Cir. 2001) ..... 2

*Grayned v. City of Rockford*
408 U.S. 104
92 S. Ct. 2294
33 L. Ed. 2d 222 (1972) ..... 13

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002) ..... 9

*In re Winship*
397 U.S. 358
90 S. Ct. 1068
25 L. Ed. 2d 368 (1970) ..... 11

*Jackson v. Virginia*
443 U.S. 307
99 S. Ct. 2781
61 L. Ed. 2d 560 (1979) ..... 11, 12

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005) ..... 11, 12

## TABLE OF AUTHORITIES (*continued*)

*Page*

*Kolender v. Lawson*
461 U.S. 352
103 S. Ct. 1855
75 L. Ed. 2d 903 (1983) ............ 13

*Lambert v. Blodgett*
393 F.3d 943 (9th Cir. 2004) ............ 9, 10

*Lindh v. Murphy*
521 U.S. 320
117 S. Ct. 2059
138 L. Ed. 2d 481 (1997) ............ 8

*Lockyer v. Andrade*
538 U.S. 63
123 S. Ct. 1166
155 L. Ed. 2d 144 (2003) ............ 9

*Medina v. Hornung*
386 F.3d 872 (9th Cir. 2004) ............ 10

*Miranda v. Arizona*
384 U.S. 436
86 S. Ct. 1602
16 L. Ed. 2d 694 (1966) ............ 5

*Penry v. Johnson*
532 U.S. 782
121 S. Ct. 1910
150 L. Ed. 2d 9 (2001) ............ 9

*Taylor v. Maddox*
366 F.3d 992 (9th Cir. 2004) ............ 10

*Walters v. Maass*
45 F.3d 1355 (9th Cir. 1995) ............ 12

*Weaver v. Palmateer*
455 F.3d 958 (9th Cir. 2006) ............ 10

*Williams v. Taylor*
529 U.S. 362
120 S. Ct. 1495
146 L. Ed. 2d 389 (2000) ............ 9

*Woodford v. Visciotti*
537 U.S. 19
123 S. Ct. 357
154 L. Ed. 2d 279 (2002) ............ 9

**TABLE OF AUTHORITIES** (*continued*)

*Page*

*Wright v. West*
505 U.S. 277
112 S. Ct. 2482
120 L. Ed. 2d 225 (1992) .......... 11

*Yarborough v. Alvarado*
541 U.S. 652
124 S. Ct. 2140
158 L. Ed. 2d 938 (2004) .......... 10

*Ylst v. Nunnemaker*
501 U.S. 797
111 S. Ct. 2590
115 L. Ed. 2d 706 (1991) .......... 10

**STATUTES**

28 U.S.C. § 2254 .......... 9-11, 13

Antiterrorism and Effective Death Penalty Act ("AEDPA")
    Pub. L. No. 104-132, 110 Stat. 1214 (1996) .......... 8, 12

California Penal Code
    § 134 .......... 1, 13, 14
    § 667 .......... 1
    § 1170.12 .......... 1